21

**WALTER WILHELM LAW GROUP**
a Professional Corporation
Riley C. Walter #91839
Kathleen D. DeVaney #156444
Danielle J. Bethel #315945
205 E. River Park Circle, Suite 410
Fresno, CA 93720
Telephone:   (559) 435-9800
Facsimile:   (559) 435-9868
E-mail:      rileywalter@w2lg.com

(SPACE BELOW FOR FILING STAMP ONLY)

Attorneys for Debtor and Plaintiff
TULARE LOCAL HEALTHCARE DISTRICT, dba TULARE REGIONAL MEDICAL
CENTER

## IN THE UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF CALIFORNIA

## FRESNO DIVISION

| | |
|---|---|
| In re<br><br>TULARE LOCAL HEALTHCARE DISTRICT, dba TULARE REGIONAL MEDICAL CENTER,<br><br>    Debtor.<br><br>Tax ID #:   94-6002897<br>Address:   869 N. Cherry Street<br>          Tulare, CA 93274 | CASE NO.  17-13797<br><br>Chapter 9 |
| TULARE LOCAL HEALTHCARE DISTRICT, dba TULARE REGIONAL MEDICAL CENTER,<br><br>    Plaintiff,<br><br>vs.<br><br>MB EQUIPMENT FINANCE, LLC, a Delaware limited liability company; and MB FINANCIAL BANK, N.A., a national banking association,<br><br>    Defendants. | ADV PROC. NO. 18-01008<br><br>Date:     N/A<br>Time:     N/A<br>Place:    2500 Tulare Street<br>          Fresno, CA 93721<br>          Courtroom 13<br>Judge:    Honorable René Lastreto II |

## FIRST AMENDED COMPLAINT TO AVOID PREFERENTIAL AND FRAUDULENT TRANSFERS

**(Defendants MB Equipment Finance, LLC and MB Financial Bank, N.A.)**

Tulare Local Healthcare District, dba Tulare Regional Medical Center, the debtor in the above-captioned adversary proceeding, brings this first amended complaint ("Complaint") and alleges as follows:

## JURISDICTION, VENUE AND THE PARTIES

1.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 157(d) and 1334.

2.     This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (F), and (O). This adversary proceeding relates to *In re Tulare Local Healthcare District, dba Tulare Regional Medical Center*, Case No. 17-13797, which was commenced on September 30, 2017 ("Petition Date") by the Tulare Local Healthcare District, dba Tulare Regional Medical Center (the "District") by filing a petition under Chapter 9 of title 11 of the United States Code ("Bankruptcy Code") on an emergency basis in the United States Bankruptcy Court for the Eastern District of California - Fresno Division ("Bankruptcy Court").

3.     Venue is proper under 28 U.S.C. § 1409.

4.     Plaintiff Tulare Local Healthcare District is a public local healthcare district organized under the Local Hospital District Law set forth in California's Health and Safety Code. The District is a municipality under Bankruptcy Code § 109(c)(1)(40) and as defined in Bankruptcy Code § 101(40). The District operates a general acute hospital facility known as the Tulare Regional Medical Center (the "Hospital"), clinics, a fitness facility, and other patient services programs. The District serves residents of Tulare County which has one of the highest percentages of people living in poverty and the lowest amounts of per capita income in the State of California. Pursuant to Bankruptcy Code § 904(5), the District is the same as a trustee because the word "trustee" means debtor when used in a section that is made applicable in a Chapter 9 case.

5.     Defendant MB Equipment Finance, LLC, a Delaware member managed limited liability company ("MB Equipment"), is the successor by merger to Celtic Leasing

Corp. ("Celtic Leasing") which was a California corporation organized under the laws of the State of California with its principal place of business located in Irvine, California. This Court has personal jurisdiction over MB Equipment, as the successor by merger to Celtic Leasing. Plaintiff is informed and believes, and on such information and belief alleges, that Celtic Leasing was a wholly owned subsidiary of defendant MB Financial Bank, N.A., a national banking association, and also did business as Celtic Commercial Finance. At all relevant times, MB Equipment, as the successor by merger to Celtic Leasing, was an entity for whose benefit the recoverable transfers alleged in this Complaint were made, and/or an immediate or mediate transferee of such recoverable transfers. Defendant MB Equipment, as the successor by merger to Celtic Leasing Corp., and Celtic Leasing Corp. are hereinafter referred to in this Complaint together as "Celtic Leasing."

6. Plaintiff is informed and believes, and on such information and belief alleges, that defendant MB Financial Bank, N.A., is a national banking association ("MB Financial") and financial institution based in Chicago, Illinois. This Court has personal jurisdiction over MB Financial. At all relevant times, MB Financial was an entity for whose benefit the avoidable transfers alleged in this Complaint were made, and/or an immediate or mediate transferee of such avoidable transfers.

## BACKGROUND FACTS

7. This Complaint arises from an unauthorized and fraudulent and/or preferential transfer of the District's assets orchestrated by Yorai "Benny" Benzeevi, MD ("Benzeevi"), Alan W. Germany ("Germany") and others not long before the District was forced to file an emergency petition for relief under chapter 9 of the Bankruptcy Code. A summary of certain events preceding the transaction with Celtic Leasing and MB Financial are set forth in this Complaint to provide the context of the unauthorized and fraudulent and/or preferential transfer of the District's assets.

8. The District is informed and believes, and on such information and belief alleges, that Benzeevi is and/or was the manager and a member of Healthcare

Conglomerate Associates, LLC, a California limited liability company ("HCCA") at all times relevant to the allegations of this Complaint. The District is also informed and believes, and on such information and belief alleges, that Benzeevi is and/or was the Chairman and Chief Executive Officer of HCCA at all times relevant to the allegations of this Complaint. The District is further informed and believes, and on such information and belief alleges, that Germany was and/or is the Chief Financial Officer and Chief Operating Officer of HCCA at all times relevant to the allegations of this Complaint.

9.    The District is governed by a Board of Directors consisting of five elected or appointed persons residing in specific electoral zones of the District (the "Board"). Pursuant to the District's Bylaws, the officers of the District shall be the members of the Board of Directors who are elected by the Board members. The duties and responsibilities of the officers of the District are set forth in Article IV of the District's Bylaws.

10.    Plaintiff is informed and believes, and on such information and belief alleges, that the District never approved a resolution appointing Benzeevi as Chief Executive Officer of the District, or entered into a contract of employment with Benzeevi to serve as the Chief Executive Officer of the District. Plaintiff is informed and believes, and on such information and belief alleges, that the District never approved a resolution appointing Germany as the Chief Financial Officer and/or Chief Operator Officer of the District, or entered into a contract of employment with Germany to serve as the Chief Financial Officer and/or Chief Operating Officer of the District.

11.    On May 29, 2014, HCCA and the District entered into a contract involving four interrelated agreements consisting of a Management Services Agreement ("MSA"), Interim Joint Operating Agreement, Joint Operating Agreement and Option (collectively, the "Contract"). Copies of the documents that comprised the Contract were filed in the District's Chapter 9 case as Docket Nos. 37, 38, 39 and 40, respectively, and as Exhibit 2 to the Declaration of Yorai Benzeevi filed on October 17, 2017. Pursuant to the MSA, HCCA was retained as the manager of the District.

12. Paragraph 4(j)(i) of the MSA entitled "Pledge of Credit" provides, *inter alia*, that "Manager shall not engage in any financial lending, financing or banking actions that result in liens, mortgages, lines of credit, security interest or financial obligations in the name of the District without the prior written consent of the Governing Body. Prior to requesting consent for approval, Manager shall provide a detailed proposal to the Governing Body describing the amount of required funding, the purpose of the financing, the strategic plan to generate sufficient revenue to pay such financing and all other alternatives evaluated to obtain sufficient funding."

13. Paragraph 4(j)(ii) of the MSA provides "Except as provided in Section 4(j)(ii), Manager shall not, under any circumstances, in the name of, or on behalf of, the District borrow any money or execute any promissory note, bill of exchange or other obligation, dispose of any asset of the District not in the ordinary course of business, without the consent of the Governing Body; and only to the extent allowed by all applicable Law."

14. In or around September 2016, citizens of the District began collecting signatures on a petition to recall then District board member Parmod Kumar ("Kumar"). Kumar had served on the District board since in or around 1994. The petition to recall Kumar was filed in or around late September 2016. Plaintiff is informed and believes, and on such information and belief alleges, that Kumar was perceived to be a close ally and staunch supporter of Benzeevi, Germany and HCCA. Plaintiff is informed and believes, and on such information and belief alleges, that the proponents of the recall petition were dissatisfied with Kumar's vote to hire HCCA as manager and Kumar's oversight of the use of $85 million in general obligation bond proceeds[1] approved by voters in 2005 (the "Bond Proceeds") intended to construct a new medical tower at the Hospital (the "Tower Project") and purchase equipment. Plaintiff is informed and believes, and on such information and belief alleges, that HCCA, Benzeevi and

---

[1] The Joint Legislative Audit Committee, at the request of State Senator Jean Fuller (R-Bakersfield), recently unanimously voted to audit the use and expenditure of the Bond Proceeds.

FIRST AMENDED COMPLAINT TO AVOID PREFERENTIAL    -5-
TRANSFER (Defendants Celtic Leasing Corp. and MB            00177779-kdd-04.30.2018
Financial Bank, N.A.)

Germany perceived the petition to recall Kumar to be adverse to their economic interests under the Contract.

15.    In November of 2016, the District conducted an election ("Election") for two seats on the Board. At that time, Kevin Northcraft ("Northcraft") and Michael Jamaica ("Jamaica") were elected by the voters of the District to serve on the Board. Northcraft and Jamaica ran on a campaign platform insisting on transparency, accountability and close scrutiny of HCCA's management of the Hospital. Plaintiff is informed and believes, and on such information and belief alleges, that HCCA, Benzeevi and Germany perceived the campaign platform and subsequent election of Northcraft and Jamaica to be adverse to their economic interests under the Contract.

16.    Plaintiff is informed and believes, and on such information and belief alleges, that HCCA, Benzeevi and Germany also believed that if the District's voters voted to recall Kumar and a new Board member was elected, a majority of the District's Board would insist on transparency and accountability and closely scrutinize HCCA's management of the District's Hospital and related patient service programs.

17.    Plaintiff is informed and believes, and on such information and belief alleges, that a few weeks after the petition to recall Kumar was filed and just prior to the November 2016 Election, Bruce R. Greene, an attorney with the law firm of Baker & Hostetler LLP ("BakerHostetler"), executed Articles of Organization of a limited liability company named Tulare Asset Management, LLC ("Tulare Asset Management"). Tulare Asset Management's Articles of Organization were filed on October 31, 2016 in the office of the Secretary of State of the State of California as document number 201630910116. The business address of Tulare Asset Management listed in such Articles of Organization is a single family residence on Lakewood Drive in Visalia, California. Plaintiff is informed and believes, and on such information and belief alleges, that the single family residence on Lakewood Drive was and/or is Benzeevi's residence at all times relevant to the allegations of this Complaint. Thus, Benzeevi conducted the business of Tulare Asset Management from his residence.

18.    After the November 2016 Election, the District's Board consisted of Kumar, Jamaica, Northcraft, Linda Wilbourn ("Wilbourn"), and Richard Torrez ("Torrez"). Wilbourn served as President of the Board. Plaintiff is informed and believes, and on such information and belief alleges, that Kumar, Wilbourn and Torrez were perceived to be close allies and supporters of Benzeevi and HCCA.

19.    The petition to recall Kumar was successful and an election was scheduled to take place on July 11, 2017 as set forth in Board Resolution No. 852 dated April 10, 2017.

20.    A few weeks before the July 11, 2017 recall election, HCCA convened a special meeting of the District's Board and proposed that HCCA be authorized to borrow up to $22 million to fund operational expenses (including costs relating to the Tower Project, repayment of indebtedness, and for other hospital purposes). A special board meeting was held on June 20, 2017 to consider HCCA's request, and the Board voted 3-2[2] to approve the request. The resolution approving the motion was given the same number as Resolution No. 852 dated April 10, 2017.

21.    A special election was held on July 11, 2017, and the District's voters recalled Kumar with roughly 81% of the votes cast in favor of recall.  In that same special election, Senovia Gutierrez ("Gutierrez") was voted to replace Kumar by winning roughly 76% of the votes cast.

22.    On July 20, 2017, the Tulare County Elections Office certified the results of the July 11, 2017 special election. Notwithstanding the overwhelming percentage of votes in favor of his recall, Kumar requested that a recount take place but then failed to timely deliver payment for the vote recount on the day it was scheduled to take place. A recount eventually did take place which confirmed the fact that Kumar was recalled by a landslide.

23.    On July 25, 2017, Gutierrez took the Oath of Office to serve as a member of the District's Board.

---

[2] Northcraft and Jamaica voted against the proposed resolution.

24.     On or about July 26, 2017, Michael Allan, an attorney representing Kumar, sent a letter to the District's Board asserting that the Board would commit a violation of the Ralph M. Brown Act ("Brown Act") if the Board recognized Gutierrez as a District Board member and demanded that the Board cease and desist from recognizing her.

25.     On July 26, 2017, at the Board's regularly scheduled meeting, Wilbourn, acting in her capacity as the District Board's President and in contravention of the will of the voters of the District, refused to recognize Gutierrez as a member of the District's Board. Wilbourn relied on the opinion expressed by HCCA's counsel, Bruce Greene of BakerHostetler who, at that time, was also counsel for the District, to justify her refusal to recognize Gutierrez as a member of the District Board notwithstanding the fact that (a) the Tulare County Elections Office had certified the result of the special election on July 20, 2017; (b) such certification was made available to the District Board; and (c) Gutierrez had taken the oath of office on July 25, 2017. Wilbourn then unilaterally canceled the July 26, 2017 District Board meeting. Notwithstanding Wilbourn's decision to unilaterally cancel the July 26, 2017 District Board meeting, Board members Northcraft, Jamaica and Gutierrez conducted a meeting and scheduled a special meeting to be held on July 27, 2017.

26.     Late in the evening of July 26, 2017, Bruce Greene, acting as counsel for HCCA and the District, stated that the District would not recognize any action taken at the July 27 Board meeting.

27.     On July 27, 2017, the District conducted a special meeting of the District's Board. At the July 27, 2017 special meeting of the District's Board, the Board approved the following motions to, among other things: (a) rescind Resolution No. 844 pursuant to which HCCA had the authority to engage legal counsel; (b) rescind Resolution No. 851 and Resolution No. 852 regarding HCCA's authority to seek loans; (c) terminate BakerHostetler as counsel for the District; (d) retain the law firm of McCormick Barstow as counsel for the District; and (e) schedule a special meeting to be held on August 9, 2017. Board members Wilbourn and Torrez did not attend that meeting.

28.     On the late evening of July 28, 2017, in an email sent to Northcraft, Bruce Greene stated that, as counsel for the District's Board, it was his opinion that the special meeting held on July 27 was invalid and that Gutierrez was not a member of the District Board. He further asserted that Northcraft, Gutierrez and Jamaica were "risking personal liability" for conducting such District Board meetings and that "there will be no insurance coverage or indemnification rights under the District's Bylaws" in the event of litigation. On Sunday, July 30, 2017, Greene reiterated these positions in another email to Northcraft sent from a Bakerlaw mobile device.

29.     On August 9, 2017, the District conducted a special meeting of the District's Board. At the August 9, 2017 special meeting, the Board approved the following motions to, among other things: (a) declare the July 11, 2017 recall election results; (b) appoint certain Board members as officers; and (c) remove all Hospital board officers. Board members Wilbourn and Torrez did not attend that meeting.

30.     On August 9, 2017, Marshall Grossman, an attorney with the law firm of Orrick, Herrington & Sutcliffe ("Orrick"), transmitted a letter to District Board members Northcraft, Jamaica and Gutierrez on behalf of his clients, Benzeevi and HCCA.[3] In the August 9, 2017 letter, Orrick asserted, *inter alia*, that the District Board meetings were "falsely billed" as official District Board meetings. Orrick demanded, among other things, that Northcraft, Jamaica and Gutierrez "cease and desist" from conducting the Board meetings "given the potential for litigation to which you may be a party."

31.     On August 23, 2017, a regular meeting of the District's Board was scheduled to take place. That very same day, Wilbourn chose to transmit a letter to Bruce Greene resigning from her position as the Board member of Zone 5 of the District as of noon that day. In an email to Northcraft transmitted late in the afternoon of August 23, Greene stated that Wilbourn and Torrez were not available to attend the District Board meeting and it would be canceled. Despite Greene's efforts to stop the District

---

[3] As the law firm of BakerHostetler firm also represented HCCA, HCCA was represented by both Orrick and BakerHostetler.

1 | Board from conducting a meeting, the Board met on August 23, 2017 to conduct the
2 | District's business.

3 |      32.     On August 24, 2017, the law firm of McCormick Barstow LLP
4 | ("McCormick"), acting as counsel for the District, transmitted a letter to Greene and
5 | John Cermack, Jr. of BakerHostetler that, among other things, reiterated the fact that
6 | the District had previously terminated BakerHostetler as counsel for the District and
7 | reminded them of a request made on August 3, 2017 that BakerHostetler turnover the
8 | District's files and electronic records as required by Rule 3-700 of the Rules of
9 | Professional Conduct.  On August 28, 2017, Peter James of BakerHostetler responded
10 | to the August 24, 2017 letter and refused to comply with the District's request based on
11 | BakerHostetler's position that Gutierrez was not a member of the District Board.

12 |      33.     On September 15, 2017, HCCA sent the District a notice stating that it
13 | deemed itself "insecure" and demanded that the District provide it with an irrevocable
14 | Letter of Credit from a U.S. banking institution acceptable to HCCA ("HCCA Notice").
15 | That same day, HCCA filed a lawsuit against the District in the Superior Court for the
16 | County of Los Angeles alleging claims for breach of contract and declaratory relief (the
17 | "HCCA Lawsuit").

18 |      34.     It was not until on or about September 26, 2017, that HCCA and Benzeevi
19 | abandoned their efforts, by and through their attorneys, to unsuccessfully block and
20 | prevent Gutierrez from serving on the District's Board.

21 |      35.     By and through the events and acts of the individuals described in the
22 | paragraphs above, Plaintiff is informed and believes, and on such information and belief
23 | alleges, that HCCA, Benzeevi, and Germany attempted to obstruct and block Gutierrez
24 | from assuming her duly elected position on the District's Board in order to allow time for
25 | HCCA, Benzeevi and Germany to: (a) close a deal whereby HCCA sold District's assets
26 | for $3 million and then obligated the District to lease those assets back from Celtic
27 | Leasing and MB Financial in the "sale and leaseback" transaction described below; (b)
28 | direct Celtic Leasing and MB Financial to wire transfer the $3 million in proceeds from

the sale of the District's assets to Tulare Asset Management's bank account over which
the District had no authority, power, control or knowledge; and (c) disburse the entire $3
million proceeds of the sale of the District's assets to other parties and/or accounts other
than the District or the District's accounts.

36.     Given HCCA's control over all aspects of the District's financial
information, HCCA knew and understood that the District was in severe fiscal distress
but failed to inform the District's Board of the actual scope and extent of the District's
financial condition until September 28, 2017.

37.     On September 28, 2017, HCCA requested in writing that the District's
Board conduct an emergency meeting on Sunday, October 1, 2017 (the "Benzeevi
Letter"). Docket No. 115 at pp. 160-61. In the Benzeevi Letter, HCCA advised for the
first time that the District had a "CRITICAL liquidity crisis," was "COMPLETELY out of
cash," that many vendors were threatening to cease providing goods and services, and
that the District lacked "sufficient cash to fund the entire gross payroll." HCCA also
alleged it was owed $7 million and would not extend further credit to the District. HCCA
further stated that it had notified the California Department of Public Health that day of
"the District's inability to fund payroll." Finally, Benzeevi wrote "[w]ithout immediate
approval for the District to obtain prompt funding, the only alternative will be for HCCA
to move immediately to cease operations at the Hospital and to consider immediately a
plan over the next several days to cease operations at the Hospital."

38.     Given the District's dire fiscal emergency, the District filed its petition
under chapter 9 of the Bankruptcy Code on September 30, 3017.

39.     On October 4, 2017, four days after the District filed its chapter 9 petition,
Benzeevi, acting in his capacity as the manager of Tulare Asset Management, filed an
LLC-12 Statement of Information with the office of the Secretary of State of the State of
California changing the street address of Tulare Asset Management, LLC from the
single family residence on Lakewood Drive in Visalia, California, to 869 N. Cherry
Street, Tulare, CA (the address of the Hospital). However, the aforementioned LLC-12

1  Statement of Information form did not change the mailing address of Tulare Asset
2  Management. At no time was Benzeevi authorized to utilize the address of the Hospital
3  and the District as the business address of Tulare Asset Management, nor was
4  Benzeevi authorized to conduct any business of Tulare Asset Management at that
5  address at any time.

**THE UNAUTHORIZED SALE AND LEASEBACK OF THE
DISTRICT'S PERSONAL PROPERTY**

8      40.    HCCA managed the District pursuant to the MSA from in or around May
9  29, 2014 until on or around November 2, 2017, the date the Bankruptcy Court entered
10  the order granting the District's motion to reject the Contract in the above-captioned
11  Chapter 9 case (Docket No. 174).

12      41.    Plaintiff is informed and believes, and on such information and belief
13  alleges, that beginning in or around late July of 2017, Germany, acting in his capacity as
14  the CFO/COO of HCCA, began discussions with Celtic Leasing to obtain a loan or
15  financing in an amount as high as $20 million. Germany pursued a loan or financing
16  with Celtic Leasing despite his knowledge that on July 27, 2017, the District's Board had
17  voted to rescind Resolution No. 851 and Resolution No. 852 regarding HCCA's authority
18  to seek loans on behalf of the District.

19      42.    In fact, on or about July 28, 2017, in pursuit of a loan or financing
20  arrangement, Germany transmitted an email to Timothy Ong of Celtic Leasing which
21  stated: "The critical factor for me is time. I would like to get this funded very quickly.
22  Thank you." Plaintiff is informed and believes, and on such information and belief
23  alleges, that HCCA was desperate to close a financing transaction as fast as possible
24  because HCCA believed and understood that:(a) the District Board had rescinded
25  Resolution No. 852 dated June 20, 2017; and (b) HCCA and Benzeevi's efforts, by and
26  through their attorneys, to obstruct Gutierrez as the duly elected Board member in the
27  recall election from serving on the District Board would not be successful.

28

FIRST AMENDED COMPLAINT TO AVOID PREFERENTIAL  -12-
TRANSFER (Defendants Celtic Leasing Corp. and MB                    00177779-kdd-04.30.2018
Financial Bank, N.A.)

43.     HCCA had no authority under Resolution No. 852 or any other resolution or document to obtain any loans or pledge the District's real or personal property as collateral for any loans.  Similarly, HCCA did not have authority to sell any real or personal property assets of the District or enter into any sale and leaseback transaction of District assets.

44.     Despite the lack of any authority to sell any District assets, pledge District assets as collateral for any loan or enter into any other type of agreement for the sale and leaseback of District assets, Benzeevi and Germany orchestrated a transaction with defendants Celtic Leasing and MB Financial to (a) sell certain personal property assets of the District to Celtic Leasing for the sum of $3,000,000; (b) obligate the District to lease that personal property back from Celtic Leasing for the sum of $82,026.00 per month over a base term of 36 months; and (c) direct Celtic Leasing to wire transfer the $3,000,000 proceeds of the sale of District assets to the bank account of Tulare Asset Management, LLC, a California limited liability company, which was owned and controlled exclusively by Benzeevi and operated out of his residence.

45.     On August 23, 2017, Benzeevi and Germany executed a document entitled "Master Lease Number CML-3826A" (the "Master Lease") allegedly on behalf of the District.  On the signature page, Germany executed the Master Lease and represented that he was the CFO/COO of the District.  Germany was never appointed, elected or authorized to be or represent himself to be the CFO/COO of the District.  On the signature page, Benzeevi executed the Master Lease and represented that he was the CEO of the District.  Benzeevi was never appointed, elected or authorized to be or represent himself to be the CEO of the District. Celtic Leasing executed the Master Lease on August 24, 2017.  A copy of the Master Lease is attached hereto as Exhibit A.

46.     In connection with the Master Lease, on August 30, 2017, Benzeevi and Germany also executed a document entitled "Organization Certificate."  By their signatures on such Organization Certificate, Benzeevi and Germany certified that they were (a) officers of Tulare Local Health Care District; and (b) Benzeevi was duly

qualified and authorized to execute on behalf of the District any and all documents and instruments in connection with the lease, purchase and sale or other disposition of the District's personal property to Celtic Leasing, including but not limited to, the Master Lease, Lease Schedules and other documents. In actuality, neither Benzeevi nor Germany was authorized to execute the Master Lease or was an officer of the District. A copy of the Organization Certificate is attached hereto as Exhibit B.

47.     In connection with the Master Lease, Germany and Benzeevi also executed: (a) an "Insurance Authorization" dated August 23, 2017; (b) a Lease Schedule No. 3826A01 dated August 23, 2017; and (c) an Addendum "A" to the Lease Schedule No. 3826A01 and Master Lease dated August 23, 2017. On each of the aforementioned documents, Germany misrepresented that he was the CFO/COO of the Tulare Local Health Care District and Benzeevi misrepresented that he was the CEO of the Tulare Local Health Care District. In actuality, neither Benzeevi nor Germany was authorized to execute any of these documents in any capacity on behalf of the Tulare Local Health Care District. Celtic Leasing executed the Lease Schedule No. 3826A01 and Addendum "A" to Lease Schedule No. 3826A01 on August 24, 2017. Copies of the Insurance Authorization, Lease Schedule No. 3826A01 and Addendum "A" to Lease Schedule No. 3826A01 are attached hereto as Exhibits C, D, and E and, respectively.

48.     On August 30, 2017, in connection with the Master Lease, Benzeevi also executed a Letter Agreement, Acceptance Certificate, and Purchase/Leaseback Agreement and Bill of Sale. On each of the aforementioned documents, Benzeevi misrepresented that he was the CEO of the Tulare Local Health Care District. In actuality, Benzeevi was not authorized to execute any of these documents in any capacity on behalf of the Tulare Local Health Care District. The purchase price for the equipment identified on Exhibit A to the Purchase/Leaseback Agreement and Bill of Sale was $3,000,000. Copies of the Letter Agreement, Acceptance Certificate, and Purchase/Leaseback Agreement and Bill of Sale are attached hereto as Exhibits F, G, and H, respectively.

49.　Plaintiff is informed and believes, and on such information and belief alleges, that in connection with the Master Lease, on August 21, 2017, defendant MB Financial Bank, N.A., caused a UCC Financing Statement to be recorded with the office of the Secretary of State of California as document no. 17-7601983921 (the "UCC1"). A true and correct copy of the UCC1 is attached hereto as Exhibit I.

50.　The Master Lease, Lease Schedule No. 3826A01 dated August 23, 2017, Addendum to Lease Schedule No. 3826A01 dated August 23, 2017, Letter Agreement, Acceptance Certificate, Purchase/Leaseback Agreement and Bill of Sale, and UCC1 are collectively referred to as the "Sale and Leaseback Documents."

51.　Plaintiff is informed and believes, and on such information and belief alleges, that at some point in time in August 2017 and prior to the date of the closing of the unauthorized sale of the District's assets to Celtic Leasing, Celtic Leasing became aware of results of the July 11, 2017 special election to recall Kumar and HCCA's efforts to prevent Gutierrez from serving as a District Board member.

52.　Plaintiff is informed and believes, and on such information and belief alleges, that on August 28, 2017, BakerHostetler, acting as special counsel to HCCA, provided Celtic Leasing with an opinion letter with respect to the sale and leaseback of the District's assets to Celtic Leasing.

53.　Plaintiff is further informed and believes, and on such information and belief alleges, that on August 25, 2017, Michael Allan, the same attorney that represented Kumar and sent a "cease and desist" letter to the District's Board threatening the Board if it recognized Gutierrez as a duly elected Board member, provided BakerHostetler with an opinion letter respecting Gutierrez's qualifications and service as a member of the District's Board.  Plaintiff is informed and believes, and on such information and belief alleges, that Celtic Leasing relied on the BakerHostetler opinion letter in order to proceed with the sale and leaseback transaction.

///

///

**CELTIC'S PAYMENT OF THE PROCEEDS OF THE UNAUTHORIZED SALE OF THE DISTRICT'S ASSETS TO BENZEEVI'S COMPANY, TULARE ASSET MANAGEMENT, LLC**

54.     Plaintiff is informed and believes, and on such information and belief alleges, that HCCA provided Celtic Leasing with wire transfer instructions to wire the sum of $3,000,000 to the account of Tulare Asset Management, LLC, Attn: Accounts Receivable, which Benzeevi operated out of his residence in Visalia California.

55.     On August 31, 2017 and prior to the wire being sent, Plaintiff is informed and believes, and on such information and belief alleges, that Celtic Leasing requested that Germany confirm that the address "for the Tulare Asset Management Account" was the same address as the District's Hospital address at 869 N. Cherry Street, Tulare, CA 93274. Plaintiff is informed and believes, and on such information and belief alleges, that Germany represented that the address of Tulare Asset Management was the same as the District's address by stating to Celtic Leasing in a written communication that "Yes, this is the same address."

56.     Plaintiff is informed and believes, and on such information and belief alleges, that Germany knew that Tulare Asset Management did not do business at 869 N. Cherry Street, Tulare, CA and was not authorized to use the District's Hospital address in any manner whatsoever. Plaintiff is further informed and believes, and on such information and belief alleges, that if Germany had provided Celtic Leasing with the registered address of Tulare Asset Management on Lakewood Drive on file with the California's Office of the Secretary of State, Celtic Leasing might be suspicious of the wire transfer instructions and not wire the $3,000,000 in proceeds from the unauthorized sale of the District's assets to Tulare Asset Management.

57.     Plaintiff is informed and believes, and on such information and belief alleges, that on August 31, 2017, MB Financial wire transferred the $3,000,000 in proceeds from the unauthorized sale of the District's assets into the account of Tulare Asset Management.

58.      At no time did Plaintiff have any relationship with, contract with or control over Tulare Asset Management. At no time, did Plaintiff have any access to, authority over or control of any bank account of Tulare Asset Management.

59.      Plaintiff is informed and believes, and on such information and belief alleges, that by no later than September 13, 2017, roughly two weeks after receiving the $3,000,000 in proceeds of the unauthorized sale of the District's assets to Celtic Leasing, Benzeevi caused the $3,000,000 to be withdrawn and transferred from the Tulare Asset Management bank account.

60.      On September 15, 2017, two days after completing the transfer of the $3 million in funds out of Tulare Asset Management's account, HCCA sent the District the HCCA Notice deeming itself "insecure" and sued the District for breach of contract and declaratory relief alleging that the District owed it over $7 million.

61.      On October 4, 2017, four days after the District filed its Chapter 9 petition, Benzeevi, acting in his capacity as the manager of Tulare Asset Management, LLC, filed an LLC-12 Statement of Information with the office of the Secretary of State of the State of California changing the street address of Tulare Asset Management, LLC from Benzeevi's residence on Lakewood Drive in Visalia, California, to 869 N. Cherry Street, Tulare, CA (the address of the District's Hospital). However, the LLC-12 Statement of Information filed by Benzeevi did not change the mailing address of Tulare Asset Management, which remained at the address of Benzeevi's residence on Lakewood Drive in Visalia, CA. A true and correct copy of the LCC-12 form filed as document no. 17-A88177 and the Tulare Asset Management LLC1 form, are attached hereto as Exhibits J and K.

### FIRST CLAIM FOR RELIEF
(Avoidable Preferential Transfers)
(11 U.S.C. § 547(b))

62.      Plaintiff realleges and incorporates by reference paragraphs 1 through 61, inclusive, of this Complaint as though fully set forth herein.

FIRST AMENDED COMPLAINT TO AVOID PREFERENTIAL    -17-
TRANSFER (Defendants Celtic Leasing Corp. and MB          00177779-kdd-04.30.2018
Financial Bank, N.A.)

63.     The unauthorized sale of the District's assets and lien created by the UCC-1 as set forth in the Sale and Leaseback Documents is a pre-petition transfer made to or for the benefit of the Defendants, who were creditors of the District at the time of the transfer as the term "creditor" is defined by Bankruptcy Code § 101(10).

64.     The pre-petition transfers constitute transfers of property of the District to or for the benefit of Defendants, and thus constitute transfers of an interest of the District in property.

65.     Plaintiff is informed and believes, and on that basis alleges, that the pre-petition transfers were made for on or on account of an antecedent disputed debt as set forth in the Sale and Leaseback Documents, all of which are dated before the Petition Date, and that Defendants allege that they are owed such debt (which the District disputes).

66.     Plaintiff is informed and believes, and on that basis alleges that the pre-petition transfers were made while the District was insolvent. Pursuant to 11 U.S.C. § 547(f), the District is presumed to have been insolvent at the time of the pre-petition transfers.

67.     Plaintiff is informed and believes, and on that basis alleges, that the pre-petition transfers enabled Defendants to receive more than they would have received if (a) the District's bankruptcy case was a case under chapter 7 of Title 11 of the United States Code; (b) the transfers had not been made; and (c) Defendants received payment of such debt to the extent provided by Title 11 of the United States Code.

68.     Plaintiff is entitled to an order and judgment against Defendants under 11 U.S.C. § 547(b) that the pre-petition transfer of the District's property be avoided pursuant to 11 U.S.C. § 547(b).

///

///

///

///

## SECOND CLAIM FOR RELIEF
### (For Fraudulent Conveyance)
### (11 U.S.C. § 548)

69.     Plaintiff realleges and incorporates by reference paragraphs 1 through 61, inclusive, of this Complaint as though fully set forth herein.

70.     Within the two year period prior to the Petition Date, as detailed above, Defendants Celtic Leasing and MB Financial received an interest in the Debtor's property as described in the Sale and Leaseback Documents.

71.     Plaintiff is informed and believes, and on such information and belief alleges, that the transfer of the interest in the Debtor's property described in the Sale and Leaseback Documents were made with actual intent to hinder, delay or defraud entities to which the Debtor was or became indebted, on or after the date that the Sale and Leaseback Documents were made or incurred.

72.     Plaintiff is further informed and believes, and on such information and belief alleges, that the Debtor received less than a reasonably equivalent value in exchange for the obligations set forth in the Sale and Leaseback Documents, and the Debtor was insolvent on the dates that such obligations were made or incurred, or became insolvent as a result of such obligations.

73.     Plaintiff is entitled to an order and judgment under 11 U.S.C. § 548(a) that the pre-petition sale of the District's assets and the obligation to lease those assets back as set forth in the Sale and Leaseback Documents be avoided pursuant to 11 U.S.C. § 548(a).

## THIRD CLAIM FOR RELIEF
### (For Recovery of Property)
### (11 U.S.C. § 550)

74.     Plaintiff realleges and incorporates by reference paragraphs 1 through 73 inclusive, of this Complaint as though fully set forth herein.

75.     As alleged above, Plaintiff is entitled to avoid the pre-petition transfers under 11 U.S.C. §§ 547 and 548(a).  As the Defendants are the initial transferees or the entities for whose benefit the pre-petition transfers and obligations were made, or the

immediate or mediate transferees of the initial transferee receiving such pre-petition transfers, or any of them, Plaintiff is entitled to recover the proceeds or value of the pre-petition transfers under 11 U.S.C. § 550.

### FOURTH CLAIM FOR RELIEF
(For Preservation of Avoided Transfer)
(11 U.S.C. § 551)

76.     Plaintiff realleges and incorporates by reference paragraphs 1 through 73 inclusive, of this Complaint as though fully set forth herein.

77.     Pursuant to 11 U.S.C. § 551, Plaintiff is entitled to preserve any transfer avoided under 11 U.S.C §§ 547 and 548(a), including the pre-petition transfers, for the benefit of the Debtor.

### FIFTH CLAIM FOR RELIEF
(Disallowance of Claim)
(11 U.S.C. § 502(d))

78.     Plaintiff realleges and incorporates by reference paragraphs 1 through 73 inclusive, of this Complaint as though fully set forth herein.

79.     Absent the Defendants returning to the Debtor the equipment sold pursuant to the Sale and Leaseback Documents and releasing the lien created by the UCC1, their claim or claims asserted against the Debtor must be disallowed in the entirety.

### PRAYER

WHEREFORE, Plaintiff requests judgment as follows:

A.     On the First Claim for Relief, for judgment in favor of the District and against Defendants avoiding the transfer as a preference pursuant to 11 U.S.C. § 547;

B.     On the Second Claim for Relief, for judgment in favor of the Debtor and against the Defendants avoiding the transfer, sale and obligations incurred as fraudulent conveyances pursuant to 11 U.S.C. § 548;

C.     On the Third Claim for Relief, for a judgment that the Debtor is entitled to recover the pre-petition transfers under 11 U.S.C. § 550;

D.     On the Fourth Claim for Relief, for a judgment that the Debtor is entitled to

preserve any transfer avoided under 11 U.S.C. §§ 547 and 548(a), including the pre-petition transfer, for the benefit of the Debtor;

E.      On the Fifth Claim for Relief, an order denying and disallowing the Defendants' claims against the Debtor until such time as any judgment rendered by this Court has been fully satisfied;

F.      On all Claims for Relief for cost of suit incurred herein, including, without limitation, attorney's fees; and

G.      Such other and further relief as this Court deems just and appropriate.

Dated: May 8, 2018                    WALTER WILHELM LAW GROUP,
                                      a Professional Corporation


                              By:    _Riley C. Walter_____
                                      Riley C. Walter, Attorneys for Plaintiff
                                      Tulare Local Healthcare District dba
                                      Tulare Regional Medical Center